1  Harold M. Jaffe (Calif. State Bar #57397)
   **LAW OFFICES OF HAROLD M. JAFFE**
2  3521 Grand Avenue
   Oakland, CA 94610
3  Tel: (510) 452-2610●Fax: (510) 452-9125
   email: jaffe510@aol.com
4
   Brian W. Newcomb (Calif. State Bar #55156)
5  **LAW OFFICES OF BRIAN W. NEWCOMB**
   770 Menlo Avenue, Ste. 101
6  Menlo Park, CA 94025
   Tel: (650) 322-7780 ● Fax: (650) 322-7740
7  email: brianwnewcomb@gmail.com

8  Attorneys for Plaintiffs STEWART ROSEN, on Behalf of Himself and All Others Similarly Situated

9              **UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

11 STEWART ROSEN, on Behalf of Himself and      CASE NO.
   All Others Similarly Situated,
12                                               **CLASS ACTION COMPLAINT FOR:**

13        Plaintiffs,                            1)   **VIOLATION OF THE LANHAM ACT
                                                      (15 U.S.C. § 1125(a);**
14                                               2)   **FALSE ADVERTISING; B & P CODE
                                                      § 17500;**
15 vs.                                           3)   **UNFAIR BUSINESS PRACTICES
                                                      PURSUANT TO B & P CODE §§
16                                                    17200, *ET SEQ.*;**
17 UBER TECHNOLOGIES, INC., a Delaware           4)   **INTENTIONAL    INTERFERENCE
   Corporation; RASIER, LLC, a Delaware               WITH PROSPECTIVE ECONOMIC
18 limited liability company; and RASIER-CA,          RELATIONS; AND**
   LLC, a Delaware limited liability company,    5)   **NEGLIGENT     INTERFERENCE
19                                                    WITH PROSPECTIVE ECONOMIC
                                                      RELATIONS**
20        Defendants.                            **DEMAND FOR JURY TRIAL**
21 _____/

22                    **I. INTRODUCTION**

23        1.      Plaintiff, Stewart Rosen, on behalf of Himself and All Others Similarly Situated

24 (referred to individually as "ROSEN" or collectively as "Plaintiffs"), complains against defendants

25 UBER TECHNOLOGIES, INC., a Delaware corporation ("UBER"), RASIER, LLC, a Delaware

26 limited liability company ("RAISER"); and RASIER-CA, LLC, a Delaware limited liability

27 company ("RAISER-CA") (or UBER, RAISER and RAISER-CA shall be collectively referred to

28 as "UBER, ET AL."), as hereinafter set forth.

## II.  BACKGROUND AND PARTIES

2.      Plaintiff ROSEN is the owner of one permitted taxicab medallion number 634, issued by the San Francisco Metropolitan Transportation Agency ("SFMTA") of the City and County of San Francisco (hereinafter referred to as "CCSF"), and has operated a medallion with Yellow Cab for more than thirty years.

3.      Plaintiffs are informed and believe and thereon allege that at all relevant times herein, defendant UBER is a Delaware corporation, with its principal place of business located at 1455 Market Street, 4th Floor, San Francisco, California, 94103.

4.      Plaintiffs are informed and believe and thereon allege that at all relevant times herein, defendant RASIER is a Delaware limited liability company, with its principal place of business located at 182 Howard Street, #8, San Francisco, California, 94105.  Plaintiffs are also informed and believe and thereon allege that at all relevant times herein, defendant RASIER is a subsidiary of UBER and licenses mobile application technology from defendant UBER.

5.      Plaintiffs are informed and believe and thereon allege that at all relevant times herein, defendant RASIER-CA is a Delaware limited liability company, with its principal place of business located at 182 Howard Street, #8, San Francisco, California, 94105. 94105.  Plaintiffs are also informed and believe and thereon allege that at all relevant times herein, defendant RASIER-CA is a subsidiary of UBER, and has obtained a class P Transportation Network Company Permit from the California Public Utilities Commission ("CPUC").

6.      UBER, a Transportation Network Company ("TNC") uses a Smart Phone Application ("APP") to connect passengers looking for rides with drivers looking to provide rides. Using the APP, customers can request rides from drivers, pay for rides, and do other things.  UBER advertises its' ride sharing service in a variety of different places - on the Internet, via e-mail and elsewhere.

## III.  JURISDICTION AND VENUE

7.      Plaintiffs bring this action to obtain injunctive relief, damages, UBER's profits, restitution, restitutionary disgorgement, and reasonable attorney's fees and costs, arising from UBER's violation of the Lanham Act (15 U.S.C. § 1125), California's false advertising law

1  (California Business & Professions Code ["B & P Code"] § 17500), and California's Unfair
2  Competition Law (B & P Code § 17200).

3       8.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 (Lanham Act
4  claims) and 28 U.S.C. § 1331 (Federal Question claims). This Court also has supplemental subject
5  matter jurisdiction with respect to the state law claims pursuant to 28 U.S.C. § 1367. Venue is
6  proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because UBER resides in this
7  district and a significant number of the events and omissions giving rise to these claims occurred in
8  this district.

9       9.    UBER is subject to the personal jurisdiction of this Court by virtue of its contacts
10  with the State of California.

11                     **IV. GENERAL ALLEGATIONS**

12       **A.**     **Regulation of UBER in California.**

13       10.    In October 2010, the Public Utilities Commission ("PUC") and the San Francisco
14  Metropolitan Transit Authority ("SFMTA") issued cease and desist orders to Ubercab, and in
15  response, UBER changed its name to UBER.

16       11.    In November 2012, the PUC issued a citation to UBER for operating and advertising
17  as a charter-party carrier, and, one month later, the Division of Management Standards ("DMS") and
18  the PUC notified UBER that it was in violation of various rules and regulations.

19       12.    In January 2013, the PUC issued a press release indicating that in December 2012,
20  it had agreed to evaluate services, like UBER, and that it was suspending its' cease and desist order
21  to UBER as well as the citation in the amount of $20,000 as of the date of the letter.

22       13.    In an article published by the Wall Street Journal on January 25, 2013, the CEO of
23  UBER was quoted as follows: "Four months after the launch in San Francisco, Uber was served with
24  a 'cease and desist' order from the California Public Utility Commission and the San Francisco
25  Municipal Transportation Agency. 'Given my background,' Mr. Kalanick says, alluding to being
26  sued at SCUOR.com., 'This was like homecoming.'" The interview continued, "Did you ever cease"
27  . "No." "Did you ever desist?" "No." On September 19, 2013, the PUC approved a "decision
28  adopting rules and regulations to protect public safety while allowing new entrance to the

1   transportation industry." In Decision No. 13-09-045 ("the Decision"), the PUC authorized UberX

2   to operate as a Transportation Network Company ("TNC") provided that it comply with various

3   items of the Decision and was otherwise legally operating. UBER failed to abide by these terms.

4   　　　　14.　　On April 7, 2014, the PUC issued a Class P public transportation permit to UBER's

5   ride sharing subsidiary, RASIER-CA, LLC ("Permit"), allowing the company to operate as a TNC.

6   Among other things, the Permit specifically indicates that UberX cannot conduct any operations on

7   the property of any airport unless that operation is authorized by the airport authority. The PUC

8   found that UBER (in contrast to UberX) is not a TNC and deferred any non-TNC related issues,

9   including UBER's potential status as a charter-party carrier of passengers ("TCP"), to a later date.

10  On July 15, 2015, the PUC in a 92 page decision found Rasier-CA, LLC in contempt for failing to

11  produce documents required by the Decision, fined Rasier-CA, LLC 7.3 million dollars and found

12  in the Decision in deciding the appropriate fine that Rasier-CA, LLC was the alter ego of UBER.[1]

13  　　　　15.　　UBER did not submit the APP technology to DMS for type evaluation.

14  　　　　16.　　In the beginning of the class period until April 7, 2014, the date of the Permit, UBER

15  X was unregulated and operating illegally in the State of California, unfairly causing injury to the

16  Plaintiffs as detailed throughout this Complaint. From April 7, 2014, UBER continued to operate

17  illegally by, *inter alia* ignoring the terms of the Permit.

18  　　　　17.　　On April 7, 2014, the DMS director wrote UBER a letter in which she informed the

19  company that it must immediately submit the APP technology for type evaluation.

20  　　　　18.　　UBER took no steps to comply with the law.

21  　　　　19.　　On June 10, 2014, the PUC wrote to UBER indicating there had been numerous

22  complaints that UBER was ignoring safety rules set forth in the Decision: UBER drivers had been

23  operating at airports without airport permits; driver cars did not display the proper "trade dress" for

24  these vehicles; numerous drivers did not have proof of insurance on their persons; drivers were seen

25  repeatedly picking up passengers at airports, even though doing so violated local ordinances; drivers

26  were observed transferring their APP from one driver to another, both of whom were using the same

27

28

[1] On August 14, 2015, Rasier-CA, LLC filed an appeal of the Decision.

1   vehicle and some drivers did not have valid driver's licenses.  UBER ignored this letter.

2          20.     Public Utilities Code § 411 makes it unlawful to violate any "rule that . . . of the

3   Commission, or . . . any operating permit or certificate issued to any charter-party carrier of

4   passengers."  As a result of violating the Permit, UBER was and is operating illegally in the State

5   of California, including the CCSF, and unfairly damaging Plaintiffs.

6          21.     In September 2014, UBER received another letter from the PUC addressing a new

7   transportation service known as UberPool.  According to the UBER blog site: "With Uberpool you

8   share a ride - and split the cost with another person who just happens to be requesting a ride along

9   a similar route.  Just push the button like before and get a car in five minutes.  When we find a

10  match, we notify you of your co-riders first name."

11         22.     UBER's new service exists in direct violation of Public Utilities Code § 5401, which

12  strictly prohibits a charter party carrier from charging passengers on an "individual-fair basis."  As

13  a result, UBER was and is operating illegally in the CCSF, unfairly damaging Plaintiffs.

14         23.     Within the past four years, UBER drivers made thousands of unauthorized trips to

15  the San Francisco International Airport.  In October 2014, the San Francisco International Airport

16  allowed UBER to operate at the airport by agreement.

17         24.     On October 10, 2014, the DMS director sent UBER another letter directing UBER

18  to submit the APP technology for type evaluation.  UBER ignored the deadline cited in the letter.

19                              **V.  FACTUAL ALLEGATIONS**

20         **A.     Plaintiffs' Taxicabs Compete With Uber Cars for Customers.**

21         25.     Plaintiffs collectively through their taxicabs of which they own the Medallions, offer

22  convenient, reliable and safe taxi service in San Francisco County.

23         26.     UBER offers consumers a smart phone app that, when downloaded, connects

24  customers looking for transportation with UBER cars.

25         27.     UBER operates in the CCSF.  Accordingly, Plaintiffs are UBER's competitors.

26  Plaintiffs and UBER seek the same dollars from the same set of customers and both Plaintiffs and

27  UBER are common carriers as that term is defined in Civil Code § 2168.

28         28.     As explained in detail below, Plaintiffs have been injured by way of UBER's false

1 and misleading advertisements. This case is brought on behalf of Plaintiffs in order to obtain

2 compensation for the unlawful actions taken by UBER.

3     **B.**     <u>**Uber Touts the Safety of Rides on Its Platform.**</u>

4             **1.**     <u>**Uber's Representations Regarding Safety on Its Website.**</u>

5     29.     UBER has offered and continues to offer numerous representations regarding the

6 safety of rides on the UBER platform.

7     30.     Various parts of UBER's website consistently emphasize that UBER offers the safest

8 rides possible. For example, one section of UBER's website states that UBER offers the "safest

9 rides on the road" as it contends that "UBER is committed to setting the bar for safety and continuing

10 to raise it." Similarly, another section of UBER's website proclaims in large capital letters it

11 offers "SAFE RIDES, SAFER CITIES."

12     31.     In addition, until as late as March 24, 2015, this part of UBER's website proclaimed

13 even more emphatically that UBER has the "safest rides on the road."

14     32.     UBER's website further states: "UBER is committed to safely connecting riders and

15 drivers. That means setting strict safety standards . . ."

16     33.     Until at least June 2, 2015, this section of UBER's website stated "Wherever you are

17 around the world UBER is committed to connecting you to the safest ride of the road. That means

18 setting the strictest safety standards possible, and working hard to improve them every day."

19     34.     UBER's blog (which can be accessed from UBER's website) also trumpets the safety

20 of UBER rides. There, UBER's head of communications - North America - Lane Casselman, stated

21 in part (in text that was posted on the blog until at least June 20, 2015):

22     **"The Bottom Line**

23         UBER works hard to ensure that we are connecting riders with the safest rides on the

24 road. The current efforts we are undertaking to protect riders, drivers and cities are just the beginning.

25         We'll continue innovating, refining, and working diligently to ensure that we are doing everything we can to make UBER the safest experience on the road."

26

27     35.     After an UberX driver struck and killed a six year old girl on December 31, 2013,

28 UBER issued a "Statement on New Year Eve Accident" in a blog post, stating, in part: "We are

1  committed to improving the already best in class safety and accountability of the UBER platform,

2  for both riders and drivers."

3     36.     UBER uses its website to try to convince customers that UBER offers safer rides than

4  taxicabs.  For example, UBER emphasizes on the UBER website that it provides "safe pick ups"

5  telling customers (until at least 2015) "No more waiting alone on a dark street hoping you can hail

6  a taxi."

7          **2.     UBER's Representations Regarding Safety in Connection with the "_Safe_**
          **_Rides Fee_".**

8

9     37.     UBER makes further representations regarding the superior safety provided on the

10  UBER platform in connection with information UBER provides customers regarding its "safe rides

11  fee" - the $1.00 fee that is charged to every U.S. rider, including those in the CCSF who hail an

12  UberX ride, no matter the duration or distance of the ride.

13     38.     Whenever a customer in the United States, including those in the CCSF, uses UberX,

14  they at the completion of their ride, receive an automatically generated email from UBER that

15  contains their bill for their transportation. This bill includes a fare breakdown (including calculations

16  for, amongst other components of the bill "base fare" and "distance.") The bill also includes a $1.00

17  fee labeled as the "Safe Rides Fee."

18     39.     The UBER website states as follows:

19          "I Was Charged a Safe Ride Fee (U.S. plus Canada only).  The Safe Rides Fee

20  supports safety efforts for the UberX platform, including among other things, a background check

21  process, motor vehicle checks, driver safety education and development of safety features in the

22  APP."

23     40.     The UBER - operated Internet siTe, until at least March 2015, stated even more

24  emphatically:

25          **"What is The Safe Rides Fee**

26          From the beginning, we have always been committed to connecting you with the
   safest rides on the road.  The Safe Rides Fee is a fee added to UberX fares on behalf of
27  drivers (who pay this fee to UBER in cities with UberX ride sharing).  This Safe Rides Fee
   supports our continued efforts to ensure the safest possible platform for Uber riders and
28  drivers . . . For complete pricing transparency, you will see the separate line item on every

1    UberX receipt.

2          In the United States (including the City and County of San Francisco), the safe rides
     fee is always $1.00."

3

4    These statements actually deceive, or have the tendency to deceive, customers into believing that

5    riders who pay the $1.00 safe ride fee to use UberX are being transported on the "safest possible

6    platform."

7          41.     Similarly, these statements actually deceive, or have tendency to deceive, customers

8    into believing that riders who pay this $1.00 per ride fees to use UberX are safer than if they chose

9    transportation by a taxicab because this "safe rides fee" is a separate line item on the receipt that

10   UBER issues to customers, bolsters the customers expectation that they should be receiving the

11   safest ride possible.  Since UBER explicitly specifies that this is an additional safety fee, it is

12   reasonable for customers in the CCSF, to expect that they will be receiving a ride safer than that

13   provided by Plaintiffs' taxicabs, as Plaintiffs' taxicabs simply charge a total fare, without imposing

14   any additional surcharge to ensure a "Safe Ride."

15         42.     The statements also explicitly represent to consumers that the entirety of each dollar

16   (Safe Rides Fee) earned by UBER  goes towards ensuring the safety of UBER riders and drivers, as

17   opposed towards UBER's bottom line or some other aspect of the company.

18         43.     On information and belief, the entirety of each dollar "safe rides fee" earned by

19   UBER does not go towards ensuring the "safest rides on the road."  Data from as far back as 2013

20   (when UBER was not as prevalent as it is today), shows that UBER was completing approximately

21   800,000 trips per week (or over 41 million trips per year), including those covered in the area served

22   by Plaintiffs' taxicabs.  Now, in 2015, UBER and UberX are more financially successful than ever.

23   Accordingly, it is clear that UBER is making a material sum of money from the "safe rides fee" that

24   it tacks on to every single UberX ride it provides.  Given the comparatively inadequate safety

25   measures that UBER has in place (as explained in detail below), UBER is not, on information and

26   belief, spending the entirety of the millions upon millions of dollars that it receives in "safe rides

27   fees" including those received in the area served by Plaintiffs' taxicabs on safety measures.

28         3.     **UBER's Representations Regarding the Superiority of Its Background**

**Checks.**

44.     As part of UBER's advertising campaign trumpeting its safety standards, UBER consistently: 1) boasts about the purportedly rigorous background checks to which UBER drivers are subject; and 2) emphasizes the purportedly inferior background checks to which taxicab drivers are subject.

45.     One section of UBER's website currently states as follows:

**"Rider Safety**

Every driver applicant is thoroughly screened through a *rigorous* background check process prior to driving with Uber (emphasis added)."

In addition, until at least April 2015, another section of Uber's website proclaimed, "Every ride sharer and livery driver is thoroughly screened through a rigorous process we have developed using consistently improving standards . . ."

46.     Until at least October 29, 2014, this section of UBER's website boasted even more emphatically about its background checks, as the website stated: "Every ride sharing and livery driver is thoroughly screened through a rigorous process we have developed using industry-leading standards."

47.     UBER's blog has elaborated on UBER's background check procedure. There, in a post that was up until at least May 2015, UBER's head of communications - North America, Lane Casselman, stated:

"All Uber ride sharing and livery partners must go through a rigorous background check. The three-step screening we've developed across the United States which includes county, federal and multi-state checks has set a new standard . . . We apply this comprehensive and new industry standard consistently across all Uber products, including UberX.

Screening for safe drivers is just the beginning of our safety efforts. Our process includes prospective and regular checks of driver's motor vehicle records to ensure ongoing safe driving. Unlike the taxi standard, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver."

48.     Until at least December 10, 2014, this blog post stated, in part, even more emphatically, that "[a]ll Uber ride sharing and livery partners must go through a rigorous background check that leads the industry."

49.     Similarly, on the website purportedly justifying the $1.00 "safe rides fee" discussed above, UBER, until October 2014, represented in part that, "[T]his safe rides fee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process."

50.     The website thereafter dropped the "industry-leading" language, but as explained above, still trumpeted until at least March 2015, that "[t]his safe rides fee supports continued efforts to ensure the safest possible platform for Uber riders and drivers."

**C.      Truth-UberX Does Not Provide a Safer Platform Than Plaintiffs' Taxicabs.**

51.     UBER's representation about the safety of its rides are false and misleading.

52.     Plaintiffs offer a safer transportation experience then UberX in a variety of different ways.

**1.      Plaintiffs, as Medallion Owners, and Those Who Lease Plaintiffs' Cabs in the CCSF, must Undergo a More Rigorous Background Check than UberX Requires.**

53.     UBER's claims that it offers industry-leading background investigations and the "safest rides on the road" (as well as claims similar to that) were and/or are false and misleading. As Plaintiffs and those who lease their Medallions from them driving Plaintiffs' taxicabs are subject to more significant scrutiny.

54.     The plaintiffs and those drivers who drive in Plaintiffs' taxicabs must submit to "Live Scan" before they can begin transporting passengers.

55.     Live Scan is considered the gold standard of background checks for a variety of reasons.   Live Scan, which uses fingerprint identification, analyzes the information in the Department of Justice and FBI systems that have no time-based or jurisdictional limitations.   In addition, Live Scan continuously refreshes the results of a person's background check, signifying that taxicab drivers who commit crimes after being initially cleared will still be caught by the system.

56.     The use of fingerprinting is a crucial aspect of Live Scan, as this fingerprinting ensures that the person whose criminal history is analyzed is, in fact, the applicant seeking to become a taxi driver.

57.     According to one article, Live Scan is "the most complete and thorough data base

1    available, which is why taxi companies are required to check their drivers through Live Scan, not

2    just search public record systems."[2]

3         58.    To the contrary, UBER does not require that UBER ex-drivers submit to Live Scan

4    testing.

5         59.    Rather, UBER's background checks are run by private third party companies,

6    including one named, Hirease. The background check process, including that employed by Hirease,

7    has both jurisdictional and time-based limits, as it screens drivers against: 1) county courthouse

8    records going back 7 years for every county of residence; 2) federal courthouse records going back

9    7 years; and 3) the multi-state criminal data base going back 7 years.

10        60.    In addition, UBER's background check process does not automatically update its

11   results. Rather, UberX drivers are required to submit to a background check only once. Thus, after

12   an UberX driver passes his/her background check, there would be no official notice to UBER if the

13   driver ever committed a crime. All UBER does after an initial partnership is to conduct ongoing

14   reviews of motor vehicle records, not all criminal records. Thus, even if an UBER ex-driver

15   committed a violent crime one week after he/she started driving for UBER, UBER would not

16   automatically be notified of this news.

17        61.    UBER's failure to require fingerprinting of its prospective drivers renders its

18   background checks inferior to those that utilize Live Scan technology (such as those the drivers of

19   Plaintiffs' taxicabs must undergo). Even Hirease, acknowledges this, as it states on its website:

20   "Fingerprinting helps uncover criminal history not discovered through traditional methods, offers

21   extra protection to aid in meeting industry guidelines, and helps prevent fraud."

22        62.    Numerous articles have highlighted the fundamental differences between the types

23   of background checks utilized by UBER and those Live Scan background checks that Plaintiffs'

24   taxicab drivers must undergo. For example, one article stated:

25            "The problem with Uber fixing its background checks is that its third party
             background checks will never equal the quality of publically regulated, law enforcement
26

27   ───────────────
     [2] The fact that UBER has downgraded the representations on its website about safety
28   demonstrates that UBER realizes that these representations to the public were false and
     misleading at the time they were made.

1    implemented background checks.  Their checks do not report information from all U.S.
     courts and only provide convictions in most cases for a fixed number of years, 7 to 10,
2    typically taxicab companies are required to use "Live Scan" a fingerprint-based background
     check of drivers filtered through the Department of Justice and FBI systems that have no time
3    based or jurisdictional limitations.  Most importantly, Live Scan automatically updates its
     results, meaning that drivers who commit crimes after being initially cleared are caught by
4    this system."

5         63.    Given the plain superiority of the Live Scan background checks that Plaintiffs, as

6    Medallion holders and those who lease their taxicabs, must pass, it is, and/or was false and

7    misleading for UBER to trumpet that it offers the best background checks possible, including but

8    not limited to, by asserting that it offers the "safest rides on the road" and that "all Uber ride sharing

9    . . . partners must go through a rigorous background check that leads the industry."

10        64.    Because it is clear that UBER is not employing the most effective background checks

11   available, it is not surprising that one UBER driver - who used to drive a taxicab - is quoted in an

12   article as stating "Uber's claim that their screening process is 'often more rigorous' than what it takes

13   to become a taxi driver is an *outright lie*."

14            **2.    Defendants' Failure to Provide Industry Leading Background Checks**
                     **Allows Drivers With Criminal Records to Become Uber Drivers.**
15

16        65.    In January 2014, in an article entitled "Uber Driver Accused of Assault," an Uber

17   driver who had served prison time for a felony, passed background check anyways," The online news

18   site Pando Daily.com reported that an Uber driver in San Francisco, who had been accused of

19   verbally and physically assaulting a passenger had passed Defendants' background check even

20   though he had a significant criminal history - including felony and misdemeanor charges, and at least

21   one felony conviction involving prison time - that should have disqualified him from becoming an

22   Uber driver.

23        66.    On December 31, 2013, an Uber driver struck and killed a six-year-old girl while

24   driving in San Francisco.  The San Francisco Business Times subsequently reported that the driver

25   had been convicted of reckless driving in Florida in September of 2014.

26            **3.    Uber Does Not Pay for the Other Safety-Related Services that Claims**
                     **They Are Supported by the Safe Rides Fee.**
27
     67.    On information and belief, Uber does not use the revenue generated from the safe
28

1   rides fee to provide for "regular motor vehicle checks" and "driver's safety education."

2        68.    UBER does not use the safe rides fee for "regular motor vehicle checks of the

3   vehicles of Uber drivers. The vast majority of Uber drivers pay for the annual inspection of their

4   own vehicles. For example, the list of potential inspection locations available to Uber drivers in

5   California includes numerous repair shops that offer inspections for a fee that averages

6   approximately $20.00. Because many Uber drivers had difficulty scheduling an inspection in 2014,

7   Uber partnered with "Your Mechanic.com" to provide Uber drivers with an opportunity to have a

8   mechanic "come to you (usually your home address) at a time of your choosing . . . [to] . . . complete

9   onsite Uber vehicle inspection and oil change for $50.00." Some Uber drivers are offered free

10  inspections provided they spend a set amount of money on repairs.

11       69.    UBER does not use the safe rides fee to provide Uber drivers with "driver safety

12  education." UBER does not require Uber drivers to participate in any type of mandatory driver

13  safety education. Instead, they advise Uber drivers that if they want to learn how to be good drivers,

14  they can pay anywhere from $40.00 to $65.00 on a class that will provide "detailed reviews" of the

15  city's neighborhoods and key routes as well as driver professionalism tips and basic safety concepts

16  for commercial drivers.

17      **4.**    **The Safe Rides Fee is a Profit Center for Defendants, Not a Genuine Fee Used to Obtain Background Checks and Fund Other Programs that**

18               **Benefit Consumer Safety.**

19       70.    Upon information and belief, Defendants generate far more revenue from the

20  assessment and collection of the $1.00 safe rides fee in the CCSF than it spends on efforts to provide

21  safe rides for the consumer's that pay the safe rides fee in the CCSF.

22       71.    Upon information and belief, UBER had as of January 2015, less than 6,000 in the

23  CCSF. Assuming *arguendo*, that UBER paid for 6,000 background checks at an average cost of

24  $50.00 per background check, UBER would have paid only $300,000 for background checks in the

25  CCSF, which is far less than the annual revenue generated by the safe rides fee in the CCSF.

26      **5.**    **Unlike UberX Drivers, Plaintiffs and Those Who Lease Their Taxis Receive Valuable Safety Training Before They Can Begin Transporting**

27               **Passengers.**

28       72.    UBER's claims that it offers the "safest rides on the road" (as well as claims similar

1  to that) are false and misleading as nearly all of the taxicab drivers driving in Plaintiffs' taxicabs,

2  including the Medallion holders, unlike UberX drivers, are required to take a driver's safety training

3  course and/or receive other valuable safety training before they can begin transporting passengers.

4        73.    This driver safety training course and other valuable safety training can include, but

5  is not limited to, a primer on the rules of the road, driver alongs (with another driver or an employee

6  at the taxicab company), defensive driving instruction, training on how to use a dispatch systems,

7  training on how to transport disabled passengers, customer service training, sensitivity training,

8  providing drivers with a helpful "driver's reference guide," and/or training on how to navigate a city.

9  This training is important as it helps the effort to ensure that Plaintiff and members of the plaintiff

10  class and those who lease taxicabs from Plaintiffs, are capable of transporting passengers safely.

11        74.    UBER does not require that it's UberX drivers take a driver safety training course,

12  nor does it provide any other substantive safety training.

13        **6.**    **Unlike UberX Drivers, Plaintiffs Must Pass a Written Examination**

14                   **Before Transporting Passengers.**

15        75.    UBER's claims that it offers the "safest rides on the road" as well as claims similar

16  to that, are false and misleading, as nearly all of the taxicab drivers driving Plaintiffs' taxicabs,

17  unlike UberX drivers, are requiring to pass a written examination before they can begin driving

18  customers.

19        76.    These examinations can test a variety of different important subjects, including but

20  not limited to, city code issues, safety, the laws of the road, the shortest routes between points, taxi

21  regulations, how to appropriately interact with customers, English proficiency, navigational skills,

22  identification of major landmarks, familiarity with the geography of the CCSF and other key topics

23  relevant to safely transport passengers.[3]

24        77.    UBER does not require that its UberX drivers pass any written examination.  To the

25  contrary, as one rider who went undercover discovered, Uber will pretty much take anyone.

26

27

28      [3] Whatever UBER calls itself, there is no doubt, as stated above, it fits the definition of a
common carrier.

1    **7.    UBER Does Not Provide a Safer Platform Than Plaintiffs Because Plaintiffs' Taxicabs Undergo More Stringent Vehicle Inspections and/or**
2    **Satisfy More Stringent Maintenance Standards Than UberX Vehicles.**

3    78.    UBER's claims that if offers the "safest rides on the road" (as well as claims similar

4    to that) are false and misleading, because UBER does not require that all vehicle on the UberX

5    platform pass a safety inspection or satisfy maintenance standards that are as stringent as those

6    required for the taxicabs owned by the Medallion holders.

7    79.    UBER's purported safety inspections and vehicle maintenance standards are a far cry

8    from those mandated for Plaintiffs' taxicabs.  On information and belief, UBER simply requires a

9    19 - point vehicle inspection, and asks the potential driver to take a picture of the vehicle inspection

10   form and receipt and email it to UBER.

11   80.    Although Plaintiffs' taxicab inspections and maintenance records vary, they are, for

12   various reasons, superior to those required by UBER.  For example, the taxicabs belonging to the

13   Medallion holders are put in a lift and raised, enabling an inspection of every possible aspect of the

14   vehicle, in order to ensure that the taxicabs are fit for service and are more stringent than UberX's

15   requirements.

16   **8.    UberX Does Not Provide a Safer Platform Than Plaintiffs, As Plaintiffs Only Drive Their Own Taxicabs or Lease Their Taxicabs to Individuals**
17   **Who Drive for One Company.**

18   81.    UBER's claims that it offers the "safest rides on the road" (as well as claims similar

19   to that) are false and misleading, because Plaintiffs and those who lease their taxicabs are prohibited

20   from using dispatch services provided by other taxicab companies.

21   82.    This is important, because it helps ensure that Plaintiffs will focus their attention on

22   driving, and not become preoccupied with various dispatch services.

23   83.    UBER does not insist that UBER drivers drive exclusively for UBER.  In fact, it is

24   commonplace for UberX drivers to drive for both UBER and ride sharing competitors, such as Lyft,

25   Inc.

26   84.    The result of UBER's failure to prohibit this practice is that these drivers often have

27   two cell phones open while transporting a passenger - with one cell phone running, the Uber App

28   in one cell phone, and one running for example the Lyft, Inc.  App.  Thus, even when an UberX

1   driver is transporting a passenger, he/she can be distracted by his/her cell phone, as it may be alerting

2   the driver that a potential Lyft passenger is seeking a ride.  This can be a distraction for UberX

3   drivers, because these drivers can be induced to take their eyes off the road, thereby jeopardizing the

4   safety of their passengers as well as their own safety, and pedestrians on sidewalks  and in

5   crosswalks.

6       **D.      UBER's False and Misleading Claims Cause Harm to Plaintiffs.**

7       85.     UBER's false and misleading advertisement caused and continues to cause

8   significant material harm to Plaintiffs.  UBER's advertising campaign actually deceives, or has a

9   tendency to deceive, customers looking for rides.   Specifically, UBER's false and misleading

10  advertisements convinced customers that UberX offers a safer ride then Plaintiffs' taxicabs.

11  Accordingly, as a result of these representations, customers opt for taking UberX rides instead of

12  taxicab rides in taxicabs with Plaintiffs' Medallions.

13      86.     This causes Plaintiffs to lose significant amounts of revenue, including but not

14  limited to, a decrease in the gate fees paid by drivers who lease their taxicabs when not being driven

15  by Plaintiffs themselves, the owners of the Medallions.

16      87.     In addition, these false and misleading advertisements leave customers with a

17  lessened view of Plaintiffs, their taxicabs, and those who lease Plaintiffs' taxicabs, thus causing

18  reputational injury to Plaintiffs.

19      88.     UBER's false and misleading advertisements have caused customers to trust

20  Plaintiffs and the drivers who lease their taxicabs, less, and to take the valuable business elsewhere.

21      89.     The false and misleading advertisements have caused lost profits.

22      90.     Instead of using fingerprints, Defendants' background check process relies upon its

23  drivers to submit personal identifiers (name, address, driver's license number and state, and social

24  security number) through an online web page.  Defendant, in turn, provides this information to

25  Hirease, Inc., who performs the background checks.

26      91.     This process cannot ensure that the information in the background check report is

27  actually associated with the applicant, because it does not use a unique biometric identifier such as

28  a fingerprint. In fact, the sample report which Hirease reports on its website has a disclaimer stating:

1  "Final verification of an individual's identity and proper use of report contents are the user's

2  responsibility."

3      92.    Taxi regulators in populous parts of the United States, including the CCSF, require

4  the drivers to undergo criminal background checks using fingerprint identification, employing Live

5  Scan. Regulators in the CCSF as well as Los Angeles, require Live Scan.

6      93.    Live Scan fingerprinting in California occurs at a facility designated by the California

7  Department of Justice. The fingerprints allow a biometric search of California Department of

8  Justice's criminal history databases and the option to obtain a search of the Federal Bureau of

9  Investigation's database of multi-state criminal history information. The process of using a

10 biometric identifying to search government databases is the "gold" standard for a background check

11 process.

12     94.    Because of the unique identifying characteristics of fingerprints, the Live Scan

13 process provides assurance that the person whose criminal history has been run is, in fact, the

14 applicant. This would ensure that a registered sex offender would not use his law-abiding brother's

15 identification information to become an Uber driver. It would also ensure that a convicted burglar

16 could not borrow his cousin's identification information to become an Uber driver in order to ease

17 the empty homes of customers he takes to the airport.

18     95.    Defendants' background check process does not provide the level of security

19 provided by the fingerprint-base Live Scan process employed for performing background checks for

20 taxi drivers, including the Medallion holders and those who lease taxicabs from the Medallion

21 holders in the CCSF.

22     96.    Notably, as reported by the New York Times, while touting its "industry leading"

23 background checks and collecting the safe rides fee from consumers, "in state houses across the

24 country, Uber has fought against legislation requiring background checks as strong as those

25 demanded of traditional taxis." In California Uber helped kill a law (Assembly Bill 612) that would

26 have required drivers to undergo a background check by the state's justice department, as is required

27 for taxi drivers.

28

1    **E.    The District Attorneys of San Francisco and Los Angeles Have Sued UBER for Some of the Same Advertising Misconduct Alleged in this Complaint.**

2

3    97.    On December 9, 2014, the Offices of the District Attorneys of the CCSF and Los

4    Angeles County filed suit on behalf of the People of the State of California against UBER. The case

5    is styled *People of the State of California v. Uber Technologies, Inc.*, San Francisco County

6    Superior Court Case No. CGC-14-543120. On August 18, 2015, a First Amended Complaint was

7    filed ("FAC"), a true and correct copy of which is attached hereto as **Exhibit 1**. Plaintiffs are

8    informed and believe and thereon allege that the allegations in the FAC are true and correct, and

9    Plaintiffs hereby incorporate by reference each and every allegation set forth in the FAC as if set

10   forth in full herein. The FAC alleges twelve causes of action against UBER based upon B & P Code

11   §§ 17200 and 17500. The FAC focuses on the same or similar false and misleading representations

12   about background checks set forth herein.

13                              **VI.  CLASS ACTION ALLEGATIONS**

14   98.    Plaintiff seeks relief in his individual capacity and as a representative of all others

15   similarly situated. Pursuant to Federal Rule of Civil Procedure ("FRCP") §§ 23(a) and 23(b)(2)

16   and/or (b)(3), Plaintiff seeks certification for class of medallion holders, specifically medallion

17   holders in the CCSF. The class is initially defined as follows:

18          *"Holders of taxicab medallions issued by the SFMTA, and who have been operating as such at any time during the period from August 25, 2011 to date ("Plaintiff Class").*

19   *Specifically excluded from the Plaintiff Class are the defendants herein; officers, directors, or employees of any defendants; any entity in which any defendant has a controlling interest;*

20   *the affiliates, legal representatives, attorneys, heirs or assigns of any defendants; and any federal, state or local governmental entity, and any judge, justice or judicial officer residing*

21   *over this matter and the members of their immediate families and judicial staffs."*

22   99.    Excluded from the class are Defendants, including any entity in which Defendants

23   have a controlling interest as a parent or subsidiary or which is controlled by Defendants, as well as

24   the officers, directors, affiliates, legal representatives, predecessors, successors and assigns of

25   Defendants.

26   100.   Plaintiffs reserve the right to amend or modify the class definition with greater

27   specificity or division into subclasses after having had an opportunity to conduct discovery.

28   **A.    Numerosity.**

101.     FRCP § 23(a)(1).  The class is so numerous that joinder of all members is unfeasible. The class consists of approximately 1,900 individuals who are owners of taxicab medallions in the CCSF.

**B.      Commonality.**

102.     FRCP § 23(a)(2) and (b)(3).  There are questions of law and fact common to the class which predominate over any questions affecting only individual members of the class.  These common questions of law and fact include, but are not limited to, the following:

a.     Whether Defendants conduct "industry leading background checks on their drivers;

b.     Whether or the extent to which Defendants use revenues generated by the collection of safe rides fee to provide "regular motor vehicle inspections";

c.     Whether or the extent to which Defendants use revenues generated by the collection of the safe rides fee to provide "driver safety education";

d.     Whether or the extent to which Defendants use revenues generated by the collection of the safe rides fee to "develop safety features for the app;

e.     Whether or the extent to which Defendants use revenues generated by the collection of the safe rides fee to support other efforts to ensure consumer safety;

f.     Whether Defendants have been unjustly enriched;

g.     Whether Defendants violated California's Unfair Competition Law and False Advertising Law, B & P Code §§ 17200, *et seq*. and 17500, *et seq*., respectively; and

h.     The nature of the relief, including equitable relief to which the Plaintiff and the class members are entitled.

**C.      Typicality.**

103.     FRCP § 23(a)(3).  Plaintiff's claims are typical of the claims of the class he seeks to represent.  Plaintiff and all class members were exposed to the same uniform practices by Defendants, rising out of and caused by Defendants' conduct.

1   **D.    Adequacy of Representation.**

2       104.    FRCP 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests

3   of the members of the class.  Further, Plaintiff's counsel is competent and experienced in litigating

4   class actions.

5   **E.    Superiority of Class Action.**

6       105.    FRCP §23(b)(3).  A class action is superior to other available methods for the fair

7   and efficient adjudication of this action since joinder of all class members is impracticable and will

8   waste judicial resources.  Moreover, the adjudication of this controversy through a class action will

9   avoid the possibility of inconsistent and potentially conflicting outcomes.  Finally, there will be no

10  difficulty in managing this action as a class action.

11  **F.    Injunctive and Declaratory Relief.**

12      106.    FRCP § 23(b)(2).  Defendants' unlawful and unfair conduct is uniform as to all

13  members of the class.  Defendants have acted or refused to act on the grounds that apply generally

14  to each class member so that any final injunctive relief or declaratory relief is appropriate with

15  respect to the class as a whole.

16                          **VII.  CLAIMS FOR RELIEF**

17                          **FIRST CLAIM FOR RELIEF**

18      **(Violation of the Lanham Act (15 U.S.C. § 1125(a) Against All Defendants)**

19      107.    Plaintiffs reallege and incorporate herein by reference each and every allegation set

20  forth above as if set forth in full herein.

21      108.    Plaintiffs compete for the same customers as UBER, and as a result, compete for the

22  same dollars.  Accordingly, Plaintiffs have standing to bring this Lanham Act against UBER.

23      109.    UBER has made false and misleading statements in commercial advertising

24  concerning the safety of riding in an UberX vehicle.  In addition, UBER has made false and

25  misleading statements in commercial advertising concerning the safety of riding in a taxicab.

26      110.    These statements misrepresent the nature, characteristics and qualities of the service

27  provided by UberX taxicabs with the Medallions owned by Plaintiffs.  These statements by UBER

28  actually deceive or have a tendency to deceive, a substantial segment of their audience.

111.     On information and belief, Plaintiffs allege that given UBER's financial resources, sophisticated personnel, and knowledge of the taxicab industry - UBER deliberately published these representations in an effort to deceive customers and influence these customer's purchasing decisions.

112.     The deception is material, as it is likely to influence the purchasing decisions of consumers who seek transportation in the form of a taxicab operated by one of the Plaintiffs or when Plaintiffs are not driving their taxicabs, by one of the leasees who lease Plaintiffs' taxicabs for an UberX ride.

113.     UBER causes its false and misleading statements to enter interstate commerce by way of advertising to and otherwise communicating with potential customers located throughout the United States, including the CCSF, including but not limited to, by publishing its advertisements on the Internet.

114.     Plaintiffs have been and are likely to continue to be injured as a result of the false and misleading statements in the form of declining gate fees from taxicab drivers who drive Plaintiffs' taxicabs when not being driven by the Plaintiffs themselves.

115.     The false and misleading statements inflict significant reputational harm on Plaintiffs as for example, customers do not believe Plaintiffs offer an experience as does UberX. For example, as a result of UBER's practices, customers do not believe that Plaintiffs' taxicabs, whether driven by themselves or drivers to whom they are leased, have passed a rigorous background check, and customers do not feel safe traveling in Plaintiffs' taxicabs.

116.     These injuries have been caused, in whole or in part, by UBER's advertising discussed herein.

117.     UBER's actions constitute a violation of the Lanham Act.  Under the Lanham Act, Plaintiffs are entitled to up to three times the damages sustained by Plaintiffs as well as UBER's profits.  Plaintiffs are also entitled to preliminary and permanent injunctive relief, because, without injunctive relief, Plaintiffs: 1) will suffer irreparable harm because of UBER's false and misleading advertising; and 2) lack an adequate remedy at law.  Further, given the exceptional circumstances of this case, Plaintiffs are entitled to reasonable attorneys' fees. Plaintiffs are also entitled to recover

1  the costs of this action.

2       118.   **WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them,

3  as hereinafter set forth.

4  **SECOND CLAIM FOR RELIEF**

5  **(False Advertising; B & P Code § 17500 Against All Defendants)**

6       119.   Plaintiffs reallege and incorporate herein by reference each and every allegation set

7  forth above as if set forth in full herein.

8       120.   Plaintiffs have standing to sue under B & P Code § 17500, because they have

9  suffered injury in fact and lost money as a result of UBER's actions as set forth herein. UBER's

10  false and misleading advertising practices have injured Plaintiffs, as potential customers of Plaintiffs

11  - due to UBER's misrepresentations, mistakenly believe that they will be safer if they travel by

12  UberX - spurn Plaintiffs' taxicabs for UberX rides, resulting in loss revenue for Plaintiffs. In

13  addition, UBER's misrepresentations caused significant reputational harm to Plaintiffs, as UBER's

14  unlawful advertising causes consumers to doubt the safety of Plaintiffs' taxicab rides, the vehicles

15  themselves and the drivers, to have, overall a lessened view of Plaintiffs. UBER's advertising

16  practices caused further injuries to Plaintiffs as alleged herein.

17       121.   UBER has engaged in false advertising, as it has disseminated false and misleading

18  representations about its services, and falsely and misleadingly compared its services to those offered

19  by Plaintiffs.

20       122.   UBER knew or should have known by exercising reasonable care that its

21  representations were false and misleading. UBER has engaged in false advertising in violation of

22  B & P Code § 17500, *et seq*. by misrepresenting in its advertising and marketing of its services to

23  the public at large and in particular to those who use or hire vehicles for transportation in the CCSF,

24  as explained herein, that it offers a safer transportation experience than offered by Plaintiffs.

25       123.   Each of the aforementioned representations alleged herein were false and misleading,

26  because UberX's drivers and vehicles were subjected to safety standards that are less strict than those

27  to which Plaintiffs' taxicabs and the drivers of Plaintiffs' taxicabs, including the Medallion holders

28  themselves, were subjected.

124.    By disseminating the publishing these statements in connection with the sale of UBER's transportation services, UBER has engaged in and continues to engage in false advertising, in violation of B & P Code § 17500, *et seq*.

125.    Plaintiffs seek injunctive relief as specifically provided in B & P Code § 17535.

126.    Plaintiffs seek to enjoin UBER from engaging in these wrongful practices, as alleged herein in the future.  There is no other adequate remedy at law and if an injunction is not ordered, Plaintiffs will suffer irreparable harm and/or injury.

127.    In addition, pursuant to CCP § 1021.5, the Plaintiffs and members of the Plaintiff Class are entitled to recover their reasonable attorneys' fees, costs and expenses incurred in bringing this action.

128.    **WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

## THIRD CLAIM FOR RELIEF

**(Unfair Business Practices Pursuant to B & P Code §§17200 *et seq*.
Against All Defendants)**

129.    Plaintiffs reallege and incorporate herein by reference each and every allegation set forth above as if set forth in full herein.

130.    Beginning on an exact date unknown to Plaintiffs, but in any event, within four years of the filing of this complaint, and continuing to the present, the Defendants engaged and continue to engage in acts of unfair competition and in unfair, deceptive or unlawful business practices within the meaning of B & P Code §§ 17200 *et seq*., including but not limited to, engaging in unlawful business practices that are, as stated above, illegal *per se*.  UBER's conduct in violating the PUC and the SF Code, as herein above described, constitute an unlawful, unfair, and/or fraudulent business practice in violation of the unfair competition law.

131.    UBER's knowing failure to adopt policies in accordance with and/or adhere to these laws, all of which are binding upon and burdensome to UBER's competitors, including the Plaintiff and members of the Plaintiff Class, results in an unfair competitive business practice for UBER, and is an unfair business practice as set forth in B & P Code § 17200, *et seq*.

1      132.    In addition to misleading the passenger public, UBER's conduct materially interferes

2  with the business of the legally authorized medallion owners who make up the Plaintiff Class.  That

3  is, UBER has been, and is currently, engaged in unfair competition within the meaning of B & P

4  Code § 17200, *et seq.*, and Plaintiffs and members of the Plaintiff Class, have suffered injuries in

5  fact, including but not limited to, a loss of income and out-of-pocket expenditures as a direct and

6  proximate result of UBER's unpermitted taxi service in the CCSF.

7      133.    Unless restrained and enjoined, UBER will continue in the acts and practices alleged

8  above.  Accordingly, the Court must issue an injunction restraining and enjoining UBER from

9  engaging in the acts and practices alleged above.  Plaintiffs further request that an order restoring to

10  the Plaintiffs and members of the Plaintiff Class all money or property which has been lost by means

11  of UBER's unfair and deceptive business practices.

12      **WHEREFORE,** Plaintiffs pray for judgment against Defendants, and each of them, as

13  hereinafter set forth.

14                          **FOURTH CLAIM FOR RELIEF**

15              **(Intentional Interference with Prospective Economic Relations**
                          **Against All Defendants)**

16

17      134.    Plaintiffs reallege and incorporate herein by reference each and every allegation set

18  forth above as if set forth in full herein.

19      135.    UBER is intentionally interfering with the economic relationship between the

20  Plaintiff medallion owners and the passenger public through its illegal acts as set forth above.

21  UBER's widely stated objective is to "disrupt" the established regulated taxi operations and

22  substitute a mobile-application-based service without regard to any regulations governing public

23  transportation services.  Therefore, UBER operates outside of the law.

24      136.    As a proximate result of UBER's wrongful and illegal conduct, Plaintiffs and

25  members of the Plaintiff Class have suffered damages in a sum according to proof.

26      137.    The aforementioned acts of UBER were and are willful, oppressive and malicious.

27  Therefore, Plaintiffs are entitled to an award of punitive damages.

28      138.    Further, unless restrained, UBER will continue to operate outside of the law, and

interfere with Plaintiffs' economic relationships with passengers who ride in taxicabs of the medallion owners, to Plaintiffs great and irreparable injury for which damages would not afford adequate relief. Therefore, Plaintiffs are entitled to injunctive relief to stop UBER's unlawful acts as set forth above.

**WHEREFORE,** Plaintiffs pray for judgment against Defendants, and each of them, as hereinafter set forth.

### FIFTH CLAIM FOR RELIEF

**(Negligent Interference with Prospective Economic Relations
Against All Defendants)**

139.    Plaintiffs reallege and incorporate herein by reference each and every allegation set forth above as if set forth in full herein.

140.    UBER is negligently interfering with the economic relationship between the Plaintiff medallion owners and the passenger public through its illegal acts as set forth above. In continuing to "disrupt" the established regulated taxi business and its operations and to substitute a mobile-application-based service without regard to any regulations governing public transportation services in the CCSF, UBER fails to act with reasonable care. Therefore, UBER operates outside the law.

141.    As a proximate result of UBER's wrongful and illegal conduct, Plaintiffs have suffered damages in an amount according to proof.

### JURY DEMAND

Plaintiffs demand a trial by jury of all claims in this complaint that are so triable.

### REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of himself, and the member of the Class proposed in this Complaint, respectfully request the Court enter judgment in their favor and against Defendants as follows:

1.    Declaring that this action is a proper class action, certifying the class as requested herein, designating the Plaintiff as class representative, and appointing the undersigned counsel as class counsel;

2.    Ordering that UBER's false and misleading statements violate the Lanham Act and

1     California's False Advertising Law, and Plaintiffs have been injured in their business

2     as a result of Defendants' violations;

3     3.     Plaintiffs recover compensatory damages. Plaintiffs shall also recover up to three

4     times their damages as provided by the Lanham Act, and shall recover UBER's

5     profits;

6     4.     UBER, its subsidiaries, affiliates, successors, assigns, transferees and their respective

7     officers and agents and employees, and all persons acting or claiming to act on their

8     behalf shall be preliminarily and permanently enjoined and restrained from

9     continuing to disseminate false and misleading statements pertaining to the safety of

10     UberX rides and/or rides with taxi companies such as Plaintiffs. Plaintiffs shall also

11     receive any other equitable relief that this Court deems just and proper;

12     5.     That the Court declare, adjudge and decree that UBER violated and continues to

13     violate Bus. & Prof. Code § 17200, *et seq.* by engaging in unlawful business

14     practices that misleads the passenger public and significantly interfere with the

15     business of the legally authorized taxicab service by the medallion owners who make

16     up the Plaintiff Class;

17     6.     That the Court declare, adjudge and decree that UBER is in violation of CPUC by

18     utilizing Black cars as taxicabs in direct competition with taxicabs owned by

19     medallion owners such as Plaintiffs and members of the Plaintiff Class;

20     7.     That the Court order UBER to pay restitution to Plaintiffs due to UBER's unlawful,

21     unfair and/or fraudulent practices, pursuant to Bus. & Prof. Code §§ 17200-17208;

22     8.     For a preliminary and permanent injunction enjoining UBER, its agents, servants,

23     and employees, and all persons acting under or in concert with them, to cease and

24     desist from any unlawful, unfair and/or fraudulent activities in violation of Bus. &

25     Prof. Code § 17200, *et seq.*, including but not limited to, the following acts:

26     a)     Utilizing Black cars as taxicabs in direct competition with the Plaintiff Class;

27     b)     Utilizing any other unlicensed or nonpermitted vehicles in direct competition

28     with the Plaintiff Class;

9. For damages in a sum according to proof;

10. For costs of suit incurred herein, plus reasonable attorneys' fees where provided;

11. For interest thereon;

12. For any such other and further relief as this Court may deem just and proper.

DATED: August 24, 2015

HAROLD M. JAFFE, on behalf of HAROLD M. JAFFE and BRIAN W. NEWCOMB, Attorneys for Plaintiffs STEWART ROSEN, on Behalf of Himself and All Others Similarly Situated