UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEWART ROSEN,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>UBER TECHNOLOGIES, INC., et al.,<br><br>　　　　　Defendants. | Case No.  15-cv-03866-JST<br><br>**ORDER GRANTING MOTION TO DISMISS AND DENYING MOTION TO STRIKE**<br><br>Re: ECF No. 22 |

Before the Court is Defendants' Motion to Dismiss and Motion to Strike.  ECF No. 22. For the reasons stated below, the Motion to Dismiss is granted and the Motion to Strike is denied. The Court also grants Defendants' requests for judicial notice.

**I.    BACKGROUND**

Plaintiff Stewart Rosen, the owner of a permitted taxicab medallion number 634, seeks to bring a class action against Defendants Uber Technologies, Inc., Rasier, LLC, and Raiser-CA, LLC ("Uber").  ECF No. 1 ¶¶ 1-6.  Uber is a transportation network company that offers a smartphone application to connect passengers looking for rides with drivers looking to provide rides.  Id. ¶ 6.  Plaintiff's claims are based on two aspects of Uber's conduct: first, its alleged failure to comply with applicable California Public Utilities Commission ("CPUC") regulations for taxi and other transportation companies; and second, its alleged misrepresentations in regards to its "safe rides fee."

**A.    Factual Background**

For the purposes of deciding this motion to dismiss, the Court accepts as true the following allegations from Plaintiffs' complaint.  See ECF No. 1.

**1.    Allegations Regarding CPUC Regulations**

Plaintiff, as an operator of a taxi, is a competitor to Uber "seek[ing] the same dollars from

the same set of customers." Id. ¶ 27.  Plaintiff alleges that from the beginning of the class period until April 7, 2014, Uber "was unregulated and operating illegally in the State of California" as a transportation company, "unfairly causing injury to the Plaintiffs." Id. ¶ 16.  Uber was issued cease and desist orders by the CPUC and the San Francisco Metropolitan Transit Authority ("SFMTA") in October 2010, a CPUC citation in November 2012 for operating and advertising as a charter-party carrier, and a Division of Management Standards ("DMS") notice that it was in violation of "various rules and regulations." Id. at ¶ 10-11.  In January 2013, the CPUC announced that it had agreed to evaluate services like Uber and was suspending its cease and desist order and its citation. Id. at ¶ 12.  On September 19, 2013, the CPUC "approved a 'decision adopting rules and regulations to protect public safety while allowing new entrance to the transportation industry." Id. at ¶ 13.  The CPUC authorized Uber to operate as a "Transportation Network Company" ("TNC"), provided that it comply with the CPUC's decision and "was otherwise legally operating." Id.

On April 7, 2014, the CPUC issued a "Class P public transportation permit" to Uber's California subsidiary, Raiser-CA, allowing the company to operate as a TNC. Id. at ¶ 14.  The CPUC found that Uber itself, however, "is not a TNC and deferred any non-TNC related issues, including UBER's potential status as a charter-party carrier of passengers ("TCP"), to a later date." Id.

Plaintiff alleges that on June 10, 2014, the CPUC wrote to Uber about numerous complaints, such as that Uber was ignoring safety rulers, that Uber drivers had been operating at airports without permits, and that some Uber drivers did not have proof of insurance or valid driver's liecenses. Id. at ¶ 19.  He further alleges that Uber is operating in violation of "Public Utilities Code § 411" and that its new service UberPool, which allows users to share rides, is in violation of "Public Utilities Code § 5401." Id. at ¶¶ 21-22.  He also alleges that Uber has made "thousands of unauthorized trips to the San Francisco International Airport" and that it has failed to submit its app to the DMS for evaluation. Id. at ¶¶ 23-24.

### 2.  Allegations Related to Safe Rides Fees

Plaintiff alleges that as part of its advertising campaign, Uber makes various statements

about the safety of rides on Uber's platform, and disparages the safety of rides offered by taxi cab companies. For example, Uber's website boasts that it offers the "safest rides on the road" and that Uber "is committed to setting the bar for safety and continuing to raise it." Id. ¶ 30. The website also stated, until at least June 2, 2015, "Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road. That means setting the strictest safety standards possible, then working hard to improve them every day." Id. ¶ 33. It emphasized that Uber provides "safe pick ups," with "No more waiting alone on a dark street hoping you can hail a taxi." Id. ¶ 36.

Uber's blog, which is easily accessible from its website, includes the following statement from Uber's Head of Communications—North America, Lane Kasselman:

> Uber works hard to ensure that we are connecting riders with the safest rides on the road. The current efforts we are undertaking to protect riders, drivers and cities are just the beginning.
>
> We'll continue innovating, refining, and working diligently to ensure we're doing everything we can to make Uber the safest experience on the road.

Id. ¶ 34. Another statement on the blog, issued after an Uber driver struck and killed a six-year old girl, reads, "We are committed to improving the already best in class safety and accountability of the Uber platform, for both riders and drivers." Id. ¶ 36.

Statements concerning safety also appear in information provided to Uber customers by email after they complete a ride using Uber. Id. ¶¶ 37-38. The email message includes a bill with a fare breakdown, including a $1.00 "Safe Rides Fee." Id. ¶ 38. Customers who clicked on a question mark next to the words "Safe Rides Fee" were, until at least March 2015, directed to a website that includes the following information:

> From the beginning, we've always been committed to connecting you with the safest rides on the road. The Safe Rides fee is a fee added to uberX fares on behalf of drivers (who may pay this fee to Uber) in cities with uberX ridesharing. This Safe Rides Fee supports continued efforts to ensure the safest possible platform for Uber riders and drivers . . . . For complete pricing transparency, you'll see this as a separate line item on every uberX receipt.

Id. ¶ 40.

Uber's advertising campaign emphasizes the rigor of its background checks for drivers. Id.

3

¶ 43. The website explains that "Every ridesharing and livery driver is thoroughly screened through a *rigorous* process we've developed using constantly improving standards . . . ." Id. ¶ 45 (emphasis added in complaint). Until at least October 29, 2014, the website stated, "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards." Id. ¶ 46.

> On Uber's blog, Kasselman elaborates on Uber's background check procedure:
>
> All Uber ridesharing and livery partners must go through a rigorous background check. The three-step screening we've developed across the United States, which includes county, federal, and multi-state checks, has set a new standard. . . . We apply this comprehensive and new industry standard consistently across all Uber products, including uberX.
>
> Screening for safe drivers is just the beginning of our safety efforts. Our process includes prospective and regular checks of drivers' motor vehicle records to ensure ongoing safe driving. Unlike the taxi industry, our background checking process and standards are consistent across the United States and often more rigorous than what is required to become a taxi driver.

Id. ¶ 47. Similarly, until October 2014, the website explaining the "Safe Rides Fee" stated that the fee "supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process." Id. ¶ 49.

However, Plaintiff alleges that Uber's representations about the safety of its rides are false and misleading because he and other taxi drivers offer safer transportation than Uber. Id. ¶¶ 51-52. Taxi drivers must submit to Live Scan, which is "considered the gold standard of background checks." Id. ¶¶ 54-55. Live Scan uses fingerprint identification; analyzes information in Department of Justice and Federal Bureau of Investigation systems that have no time-based or jurisdictional limitations; and continuously refreshes the results of a person's background check. Id. ¶ 55. By contrast, Uber's background checks, which are run by a private third-party company, do not involve fingerprinting; have jurisdictional and time-based limits; and are not automatically updated to reflect new information. Id. ¶¶ 59-61. Drivers who have served prison time for felony charges and were convicted of reckless driving have passed background checks and/or driven for Uber. Id. ¶¶ 65-66.

In addition, Plaintiff alleges that Uber generates far more in revenue from its $1.00 safe

rides fee than it spends on efforts to provide safe rides. Id. ¶ 70. He alleges that Uber does not use the fee to check Uber drivers' vehicles, but instead "[t]he vast majority of Uber drivers pay for the annual inspection of their own vehicles." Id. ¶ 68.

Similarly, Uber does not use the safe rides fee "to provide Uber drivers with 'driver safety education.'" Id. ¶ 69. Unlike Uber drivers, nearly all taxicab drivers are required to take a driver safety course and/or other safety training and to pass a written examination before transporting passengers. Id. ¶¶ 71-72. Taxicab vehicle safety inspections and maintenance standards are also more stringent than those required by Uber. Id. ¶¶ 78-80. Unlike Uber drivers, taxicab drivers are prohibited from driving for more than one company, which ensures that they are focused on transporting passengers, rather than toggling between dispatch services. Id. ¶¶ 81-84. Because Uber drivers often also drive for a ridesharing competitor such as Lyft, Inc., they can be distracted by attempting to manage ride requests on multiple platforms, often using more than one cellphone. Id.

Uber's false and misleading advertisements cause harm to Plaintiff because they convince customers that Uber offers safer rides than taxi companies. Id. ¶ 85. As a result of Uber's representations about safety, customers choose to use Uber rather than taking a taxi, causing Plaintiff to lose significant revenue and suffer reputational injury. Id. ¶¶ 86-89.

**B.     Procedural Background**

Plaintiff filed his complaint on August 24, 2015. Id. Plaintiff alleges five causes of action: (1) the Lanham Act, 15 U.S.C. § 1125(a); (2) California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 ("FAL"); (3) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 ("UCL"); (4) Intentional Interference with prospective economic relations; and (5) Negligent Interference with prospective economic relations. Id. ¶¶ 107-141. On September 21, 2015, the case was related to L.A. Taxi Cooperative, Inc. v. Uber Technologies, Inc. ("L.A. Taxi"), Case No. 3:15-cv-01257-JST. ECF No. 14. Uber filed this motion to dismiss on January 7, 2016. ECF No. 22. Plaintiff opposed the motion. ECF No. 27.

Defendants assert in their motion that Plaintiff's complaint repeats the allegations made in Plaintiff's earlier complaint in San Francisco Superior Court. ECF No. 22 at 13-14. The Superior

5

1 Court sustained a demurrer filed by Defendants.  Id.  Defendants also assert that Plaintiff's

2 allegations regarding Uber's "safe rides fee" are copied from the complaint in L.A. Taxi.  Id. at 7.

3 Indeed, the Court notes that Plaintiff's allegations in this case are similar to those made by the

4 L.A. Taxi Plaintiffs in their original complaint.  Compare ECF No. 1, ¶¶ 25-97 with ECF No. 1,

5 L.A. Taxi, Case No. 3:15-cv-01257-JST, ¶¶ 34-106.

### C.  Jurisdiction

The Court has jurisdiction over this action pursuant to 28 U.S.C. sections 1331 and 1367.

## II.  JUDICIAL NOTICE

Generally, a Court's review on a motion to dismiss is limited to the allegations contained in the complaint at issue.  Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001). However, a Court may consider documents on which a complaint "necessarily relies" even if those documents are not physically attached to the pleading document itself.  Id. (citation omitted). Moreover, under Federal Rule of Evidence 201, courts may take into account matters of public record, as long as they are not subject to reasonable dispute.  Id. at 689.

Uber has filed a request for judicial notice that asks the Court to take notice of twenty-five documents, all of which are either referenced in the complaint, are publicly available CPUC documents or decisions, or are publicly available documents filed in California court cases.  ECF No. 22-3.  Plaintiff does not contest that the Court may take judicial notice these documents, but argues that the Court should decline to consider all but four of the documents on the principle that "judicial notice should be utilized sparingly in the early stages of litigation."[1]  ECF No. 27-1 at 2.

---

[1] Plaintiff cites as authority for this proposition a publication titled "Rutter Group Practice Guide, Federal Civil Procedures and Evidence, ¶¶ 8:936.3 - 8:936.4 (The Rutter Group 2015)."  Plaintiff quotes the same publication as stating that "only in the clearest of cases should a district court reach outside the pleadings for facts necessary to resolve a case at that point."  ECF No. 27-1 at 2. The Court is not familiar with any publication by that title.  The Court has reviewed the treatise by Schwarzer, et al., Federal Civil Procedure Before Trial (Rutter Group 2015), and neither the quoted text nor Plaintiff's asserted proposition appear there.  That volume says only, "For purposes of a Rule 12(b)(6) motion . . . the court can 'augment' the facts and inferences from the body of the complaint with "data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice."  Id. at ¶ 9:211 (citing Haley v. City of Boston 657 F3d 39, 46 (1st Cir. 2011)).

The quoted phrase appears to be taken from a Third Circuit case, Victaulic Co. v. Tieman, 499 F.3d 227, 236 (3d Cir. 2007).  A review of that case discloses several problems with judicial

6

The Court concludes that judicial notice is appropriate and grants Uber's request. The Court takes notice that the documents exist as well as the existence of the allegations contained in those documents, but does not take notice of the allegations asserted in the documents as facts. Lee, 250 F.3d at 689-90.

In addition, Uber has filed a supplemental request for judicial notice of two additional documents, one of which was filed in Plaintiff's Superior Court case and one of which was filed in this case. ECF No. 29-2. This request is unopposed. The request is granted, in the same manner as described above.

## III. MOTION TO DISMISS

### A. Legal Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Fed R. Civ. P. 8(a)(2); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Knievel v. ESPN, 393 F.3d 1068, 1072 (9th Cir. 2005).

Defendants advance three arguments against Plaintiff. First, they argue that the Court should agree with the San Francisco Superior Court and dismiss Plaintiff's CPUC-related claims for lack of jurisdiction under California Public Utilities Code section 1759(a). ECF No. 22 at 17.

---

notice that are not present here. Also, the concern underlying the Victaulic ruling seems to have been that "in some instances the judicial notice decision comes so early that it effectively disadvantages one of the litigants." Coleen M. Barger, Challenging Judicial Notice of Facts on the Internet Under Federal Rule of Evidence 201, 48 U.S.F. L. Rev. 43, 67 (2013). Plaintiff does not argue, and the Court is unable to see, how taking judicial notice of the CPUC documents that Plaintiff himself has put at issue disadvantages him.

United States District Court
Northern District of California

1  Second, they argue that Plaintiff's FAL and UCL claims should be dismissed in the same fashion
2  that the Court dismissed similar claims in L.A. Taxi. Id. at 26. Third, they argue that Plaintiff's
3  interference claims should be dismissed because he has not alleged a protected economic
4  relationship. Id. at 29. The Court considers each argument in turn.

### B. CPUC-related claims

The gravamen of Plaintiff's CPUC-related claims is that Uber has failed to follow applicable CPUC regulations despite operating as a company that provides transportation to customers. Plaintiff alleges under his UCL claim that Uber's "knowing failure to adopt policies in accordance with and/or adhere to" the laws and regulations of the CPUC and the San Francisco Code, "all of which are binding upon and burdensome to UBER's competitors," results in an unfair competitive business practice for Uber. ECF No. 1 at ¶ 131. Similarly, in his interference claims, he alleges that Uber's "widely stated objective is to 'disrupt' the established regulated taxi operations and substitute a mobile-application-based service without regard to any regulations governing public transportation services. Therefore, UBER operates outside of the law." Id. at ¶ 135.

Uber argues that this Court lacks jurisdiction to hear these claims because doing so would require the Court to intrude into the purview and decision making of the CPUC. ECF No. 22 at 17. California Public Utilities Code section 1759(a) provides that:

> No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court.

Uber presented a similar argument in its demurrer in state court, and that court sustained the demurrer on those grounds. The Superior Court found that "the CPUC has assumed jurisdiction over all of the Defendants and all of the issues encompassed and relief prayed for by Plaintiff's complaint." Order Sustaining Demurrers to Complaint with Leave to Amend and Denying Motion to Strike, Exhibit O to Request for Judicial Notice, ECF No. 22-7 at 4. "The relief sought by Plaintiff's complaint would require findings contrary to the CPUC decision and therefore would hinder and interfere with the CPUC's exercise of its regulatory authority." Id. at

5. Uber now asks this Court to reach the same holding.

### 1. Section 1759

Under California law, courts use a three-prong test to determine whether a court is barred from granting requested relief under section 1759(a): "(1) whether the [C]PUC had the authority to adopt a regulatory policy on the subject matter of the litigation; (2) whether the [C]PUC had exercised that authority; and (3) whether action in the case before the court would hinder or interfere with the [C]PUC's exercise of regulatory authority." Kairy v. SuperShuttle, Intern., 660 F.3d 1146, 1150 (9th Cir. 2011) (quoting San Diego Gas & Electric Co. v. Superior Court (Covalt), 13 Cal. 4th 893, 923 (1996))  Federal courts use the same Covalt test.  Id.

In Covalt, the plaintiffs sued San Diego Gas and Electric Company (SDG&E), alleging that they used power lines on land adjacent to their home that emitted dangerous levels of electromagnetic radiation.  Covalt, 13 Cal. 4th at 911.  The California Supreme Court held that the courts lacked jurisdiction under section 1759 to consider the Covalts' claims because they overlapped with the jurisdiction of the CPUC.  In regards to the third prong of the Covalt test, it held that section 1759 bars court action "not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy."  Id. at 918; see also Waters v. Pacific Tel. Co., 12 Cal. 3d 1 (1974).

The court also acknowledged the tension between section 1759 and section 2106 of the same act, which authorizes a private remedy against public utilities that violated the law. Id. at 916.  It explained that when a private action challenges "a ruling of the commission on a single matter such as its approval of a tariff or a merger, the courts have tended to hold that the action would not 'hinder' a 'policy' of the commission" and therefore could be heard.  Id. at 918-919.  However, "when the relief sought would have interfered with a broad and continuing supervisory or regulatory program of the commission, the courts have found such a hindrance and barred the action under section 1759."  Id. at 919.

Explaining further, the California Supreme Court examined several contrasting cases from the California Courts of Appeal. It noted that courts may consider a claim that cellular telephone services were fixing prices under the Cartwright Act even though the commission had previously authorized the challenged rates, because the commission only considered whether the rates were "reasonable" and not whether they violated the Cartwright Act. Id. at 919 (citing to Cellular Plus, Inc. v. Superior Court, 14 Cal. App. 4th 1224 (1993)). A claim of price fixing would not "hinder or frustrate" any of the commission's ongoing regulations or policies, nor did it "seek any relief requiring the PUC to change any rates it had approved." Id. (quoting Cellular Plus, at 1246). Similarly, courts could consider a stockholder class action challenging a merger of telephone utilities for breach of fiduciary duty even after the commission had approved the merger, as there were no supervisory or regulatory policies "ever formulated or relied upon by the commission on the subject of safeguarding minority investor interests." Id. at 920 (quoting Stepak v. American Tel. & Tel. Co., 186 Cal. App. 3d 633, 640-41 (1986).

The California Supreme Court contrasted these cases with Brian T. v. Pacific Bell, 210 Cal. App. 3d 894 (1989), in which a claim was brought against telephonic "information access services" from numbers bearing the 976 prefix, based on allegations that the service had disseminated sexually explicit information to a minor. Id. at 920. In tandem with the Federal Communications Commission, the CPUC had begun an investigation into 976 services based on these concerns, and had issued interim decisions approving a method for selectively blocking sexually explicit messages. Id. at 920 (citing to Brian T., 210 Cal. App. 3d at 900-901). For this reason, the claims brought in Brian T. would in effect call for a modification of the commission's prior decisions approving the 976 services. Id. at 921.

In the same vein, the California Supreme Court noted Schnell v. Southern Cal. Edison Co., 204 Cal. App. 3d 1039 (1988), which dealt with the setting of "baseline" rates for baseline quantities of gas and energy. Id. at 921-922. The Schnell plaintiff was an owner of an RV park who argued that he was entitled to a "residential baseline allocation" normally given to utility customers who furnished gas and electricity to their subtenant residents. Id. The Schnell court held that the claim, which was fundamentally over "the appropriate rate schedule for RV parks,"

1  interfered with ongoing commission proceedings regarding how to classify and schedule rates for
2  RV parks.  Id. at 923 (citing to Schnell, 204 Cal. App. 3d at 1046).

3        Applying these principles, the Covalt court concluded that the Covalts' claims were barred
4  by section 1759.  In addition to holding that many of the claims failed to state a cause of action,
5  the court held that Plaintiffs' claims interfered with the CPUC's authority.  Granting relief to the
6  Covalts would have required the court to conclude that a reasonable objective person would
7  experience substantial fear from the electromagnetic fields, but this conclusion would contradict
8  the commission's findings that the available evidence did not support a belief that the fields at
9  issue presented a substantial risk of physical harm.  Id. at 939.

### 2. Plaintiff's Claims

11        In this case, Uber asserts – and Plaintiff does not appear to dispute – that the first two
12  prongs of the Covalt test are easily met.  ECF No. 22 at 18-19, The Court agrees, and finds that the
13  CPUC has the authority to adopt regulatory policies regarding transportation companies, and has
14  exercised that authority with regard to Uber.  See ECF No. 1 at ¶¶ 10-14 (alleging that the CPUC
15  has issued cease-and-desist letters, citations, notices, and decisions regarding Uber's compliance
16  with its regulations).

17        The third prong asks this Court to determine whether Plaintiff's CPUC-based claims
18  require this Court to take action that would "hinder or interfere with the [C]PUC's exercise of
19  regulatory authority."  Plaintiff's complaint prays, among other remedies, that the Court "declare,
20  adjudge and decree that UBER is in violation of CPUC [sic] by utilizing Black cars as taxicabs in
21  direct competition with taxicabs owned by medallion owners such as Plaintiffs," and that Uber be
22  enjoined from "[u]tilizing Black cars as taxicabs," and "[u]tilizing any other unlicensed or
23  nonpermitted vehicles in direct competition with the Plaintiff Class."  ECF No. 1 at 26.  The crux
24  of his CPUC-based claims appears to be his allegation that, until Uber's subsidiary was issued a
25  permit on April 7, 2014, Uber "was unregulated and operating illegally in the State of California."
26  ECF No. 1 ¶ 16.

27        The Court concludes that granting relief on any of these claims would "interfere[] with a
28  broad and continuing supervisory or regulatory program" of the CPUC.  Covalt, 13 Cal. 4th at

919. Plaintiff's own complaint acknowledges that in December 2012, the CPUC rescinded a citation it had previously issued to Uber, and began to "evaluate services" like Uber in relation to its regulations. ECF No. 1 ¶ 12. It further alleges that the CPUC adopted rules and regulations affecting Uber in September 2013, that it issued a permit to Uber's subsidiary Raiser-CA on April 7, 2014, and "deferred any non-TNC related issues, including UBER's potential status as a charter-party carrier of passengers ("TCP"), to a later date." Id. ¶ 14. This deferment is relevant, of course, because if Uber is ultimately classified as a "TCP" it would presumably be required to follow the same regulations as other TCPs.

Uber elaborates on these allegations, noting that the December 2012 order by the CPUC instituted rulemaking, which is still ongoing, to consider how to supervise "new businesses" that "offer new ways of arranging transportation of passengers over public highways for compensation" through smartphone apps. Order Instituting Rulemaking, Exhibit G to Request for Judicial Notice, ECF No. 22-5 at 16; see also ECF No. 22 at 11. Uber also expands on the CPUC's September 2013 decision, which stated that the newly created category of TNCs like Uber were not subject to local taxi regulation, and that it would continue to convene workshops on regulations of TNCs and may choose to open new proceedings to update their rules. See ECF No. 22 at 11-12; see also Decision Adopting Rules and Regulations to Protect Public Safety While Allowing New Entrants to the Transportation Industry, Exhibit A to Request for Judicial Notice, ECF No. 22-4 at 2.

These proceedings are not the kinds of "single matter[s] such as . . . approval of a tariff or a merger," described in Covalt. On the contrary, Plaintiff has alleged that the CPUC has issued decisions regarding Uber's compliance, and obligations to comply, with various transportation regulations and its intent to "defer" additional discussions on those issues "to a later date." See ECF No. 1 at ¶¶ 13-14. By asking the Court to decide whether Uber has failed to follow CPUC regulations, Plaintiff therefore asks the Court to hinder or interfere with a broad and continuing CPUC program. Much as the plaintiffs in Covalt asked the California courts to re-consider the CPUC's conclusion that the electromagnetic fields at issue did not present a substantial risk, Plaintiff in this case asks this Court to re-consider the CPUC's ongoing decisions as to which

1  regulations Uber is required to follow, and whether it has done so.

### 3. Plaintiff's Response

In his response, Plaintiff does not contest Uber's portrayal of either his own claims or of the CPUC's regulatory conduct in regards to Uber. He cites to several cases to assert that his claims may in fact be heard by this Court despite section 1759. Plaintiff's authority is not persuasive.

Plaintiff cites first to Cundiff v. GTE California Inc., 101 Cal. App. 4th 1395, 1406 (2002), which held that section 1759 did not bar claims by customers of phone companies that they were being deceived in regards to excessive monthly rental fees for their telephones. ECF No. 27 at 11. The California court noted that plaintiffs' challenges were not to the *amount* of the rental fee or the decision to charge a fee — both of which were approved by the commission — but rather the *manner* in which defendants were billing customers, or "specifically, the alleged lack of information given to plaintiffs about the rental charge." Id. at 1406. Plaintiff also cites to Hartwell Corp v. Superior Court, 27 Cal. 4th 256, 276-77 (2002), in which the California Supreme Court dismissed some of the plaintiffs' claims that water companies were providing unsafe drinking water. To the extent that the claims asserted the water was unhealthy despite meeting regulatory standards, the court held that awarding relief would violate section 1759 because it would call into question the validity of the commission's water quality standards. Id. However, to the extent the claims asserted that the water failed to meet those standards, they were not barred. Id.

Plaintiff argues that his case, like in Cundiff and the surviving claims in Hartwell, remain sufficient because he is "not challenging the CPUC's regulations regarding transportation carriers," but rather "the conduct of the entities themselves in the market place." ECF No. 27 at 11. It is true that Plaintiff is not challenging the sufficiency of CPUC's regulations themselves, but this argument fails to apprehend the jurisdictional problem under section 1759. Plaintiff's CPUC-related claims are barred because they interfere with the CPUC's decisions as to whether Uber is subject to its various regulations, and its ongoing policymaking in relation to that issue. Regardless of whether the regulations themselves are sufficient, the CPUC is engaged in a

"broad and continuing supervisory and regulatory program" in regards to Uber's obligation to follow those regulations.

Plaintiff's other cited cases are equally unhelpful. He cites to Wise v. Pacific Gas & Elec. Co., 77 Cal. App. 4th 287, 295 (1999), in which the court declined to dismiss claims that PG&E failed to provide certain services for which they had charged customers because those claims did not interfere with any CPUC policy. This case is easily distinguishable from Wise, as Plaintiff is specifically challenging whether or not Uber is required to, and has, followed CPUC regulations. Likewise, Plaintiff seeks to contrast this case with Davis v. S. Cal. Edison Co., 236 Cal. App. 4th 619, 642-43, in which the court barred a plaintiff's claims regarding his application to connect his solar generating equipment to the electricity grid. Plaintiff argues that "[u]nlike the complexity in Davis, which would require a trial court to enter into the realm of utility tariff rules," this case does not require the Court to interpret or consider the validity of any CPUC regulations. ECF No. 27 at 13. In fact, the court barred plaintiff's claims in Davis because they overlapped with pending administrative complaints with the commission on the same issue, as well as because the tariff rule at issue stated that the CPUC should exercise "initial jurisdiction" in interpreting it. Id. at 642-43.

Lastly, Plaintiff cites to Kairy v. SuperShuttle Intern., 660 F.3d 1146, 1153-54 (9th Cir. 2011). In that case, employees of SuperShuttle asserted that they were *de facto* employees under California law and therefore misclassified as independent contractors. SuperShuttle argued that this claim was barred under section 1759 due to a CPUC rule that required vehicle drivers to operate under "complete supervision." Id. According to SuperShuttle, this requirement was effectively synonymous with the California definition of *de facto* employees, and so required companies like SuperShuttle to treat their independent contractors the same as they would *de facto* employees. Id. Thus, SuperShuttle unsuccessfully argued, a court determination that SuperShuttle was misclassifying its drivers as independent contractors despite meeting the CPUC's requirements would call those requirements into question.[2]

---

[2] The Kairy court rejected this argument because it did not agree with SuperShuttle's interpretation of that the "complete supervision" requirement. Id. at 1153. It instead agreed with the plaintiffs,

14

Plaintiff argues that his claims, just like in Kairy, should not be barred because they do not interfere with CPUC's regulatory authority over transportation companies. ECF No. 27 at 14. Once again, however, this misunderstands the jurisdictional problem. Plaintiff's claims are barred not because they challenge the validity of the CPUC's regulations themselves, but rather because they interfere with the CPUC's ongoing process of determining which regulations Uber and other new TNCs must follow.

Accordingly, this Court agrees with the San Francisco Superior Court that Plaintiff's CPUC-based claims are barred by section 1759. Any of Plaintiff's claims that depend on allegations of non-compliance with CPUC regulations are dismissed without prejudice. Though Uber asserts that leave to amend would be futile, the Court does not agree. Plaintiff's current claims interfere with CPUC's authority, but Plaintiff may still be able to allege non-compliance by Uber that would not hinder ongoing CPUC supervision and regulation.

The Court now turns to the remainder of Plaintiff's claims that depend, not on CPUC-based allegations, but rather on Uber's alleged misrepresentations regarding its safe rides fees.

### C.  UCL/FAL Claims

Defendants argue that Plaintiff's claims should be dismissed for the same reasons that this Court granted in part a motion to dismiss similar claims in the L.A. Taxi case. ECF No. 22 at 26. That order was issued on July 17, 2015, and as relevant here, it dismissed the UCL claim in their entirety and struck claims under the FAL for restitution. Order Granting in Part and Denying in Part Motion to Dismiss ("L.A. Taxi Order"), ECF No. 44, L.A. Taxi, Case No. 3:15-cv-01257-JST.[3]

The Court explained in the L.A. Taxi Order that the UCL claims must be dismissed due to lack of standing. Id. at 15. It noted that the California Supreme Court has held that "the amended UCL 'imposes an actual reliance requirement on plaintiffs' who bring a UCL action 'based on a

---

who contended that the "complete supervision language" was not meant to change the definition of "independent contractor" but merely to require supervision over "safety- and service-related issues." Id. at 1153-54.

[3] In addition, the L.A. Taxi Order also dismissed claims under the Lanham Act to the extent they challenged protected speech in the media. L.A. Taxi Order at 18. Plaintiff in this case has not included any allegations relating to Uber's statements in the media.

15

fraud theory involving false advertising and misrepresentations to consumers' because 'reliance is the causal mechanism of fraud.'" Id. (quoting Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC, No. 14-cv-0437-CW, 2015 WL 3377662, at *6 (N.D. Cal. Feb. 24, 2015)). While it noted a split between federal courts on the issue, this Court joined the majority of courts in enforcing this rule, and concluded that "because Plaintiffs do not plead their own reliance on Uber's allegedly false advertising," but rather only the reliance of their potential customers, "they lack standing to seek relief under the UCL's fraud prong." Id. at 16. Moreover, because the L.A. Taxi Plaintiffs' claims under the UCL's unfair and unlawful prongs were predicated on the same theory, they similarly lacked standing under those prongs as well. Id.

As noted above, Plaintiff's allegations in this case relating to Uber's misrepresentations are, to say the least, strikingly similar to those in L.A. Taxi. In both cases, taxi cab owners and/or drivers argue that they have been injured, as competitors with Uber, by Uber's misrepresentations to its customers regarding the safety of its rides. Mr. Rosen offers no argument as to why the Court should deviate from its prior conclusion in L.A. Taxi. He notes only that "this area is not settled law," and that this Court had acknowledged as much. ECF No. 27 at 15. Accordingly, in line with this Court's L.A. Taxi order, Plaintiff's UCL claims are dismissed without prejudice. See L.A. Taxi Order at 18.

In regards to the FAL claims (as well as the dismissed UCL claims), this Court held that the L.A. Taxi plaintiffs had no claim for restitution because such claims were limited to situations in which defendants directly took property from plaintiffs, or in which plaintiffs had a vested interest in the property. Id. at 17. However, the L.A. Taxi plaintiffs "do[] not allege an ownership interest" in any of the profits that Uber obtained. Id. The Court therefore dismissed any FAL claims that requested restitution. Id. at 18. Here, similarly, Plaintiff has not alleged any vested interest in these profits, but only points to the possibility that Uber's customers would use his taxicab instead. Once again, Plaintiff does not suggest that this reasoning is incorrect. Accordingly, his claims under the FAL are dismissed without prejudice to the extent they request

restitution.[4]

### D. Interference Claims

Lastly, Defendants assert that Plaintiff's two interference claims must be dismissed because he does not allege a "legally protected relationship with a third party" ─ that is, with the customers for which both he and Uber compete. ECF No. 22 at 29. As an initial matter, the Court notes that the allegations in Plaintiff's two interference counts appear to focus on Uber's failure to comply with CPUC regulations. See, e.g., ECF No. 1 ¶ 140 (alleging that Uber "is negligently interfering with the economic relationship between the Plaintiff medallion owners and the passenger public" by "substitut[ing] a mobile-application-based service without regard to any regulations governing public transportation services"). To the extent that Plaintiff's interference claims are dependent on his CPUC-based allegations, they are dismissed under section 1759. In the event that Plaintiff seeks to also bring interference claims based on its allegations regarding Uber's safe rides fee, the Court now turns to Defendants' contentions.

Defendants argue that Plaintiff has failed to establish more than an "economic relationship with the entire market of all possible but as yet unidentified buyers." ECF No. 22 at 29 (quoting Westside Ctr. Assoc. v. Safeway Stores 23, Inc., 42 Cal. App. 4th 507, 527 (1996)). In Westside Center, the court held that a claim of interference with prospective economic advantage required an "economic relationship between the plaintiff and some third party," which included showing that it was "reasonably probable that the prospective economic advantage would have been realized but for defendant's interference." Westside Ctr., 42 Cal. App. 4th at 521-22. The court explained that generally, the sorts of "expectancies" typically protected are those established through a binding contract. Id. at 522. Based on this principle, it rejected the claim of a shopping center owner that Safeway, by moving out of its flagship spot in the center, interfered with their efforts to sell the property. Id. at 523. This claim required reliance on a "purely hypothetical

---

[4] These points provide sufficient grounds to dismiss Plaintiff's UCL claims and FAL claims requesting restitution. Uber further appears to argue that Plaintiff's FAL claims should be dismissed in their entirety due to failure to plead a claim. See ECF No. 22 at 27-29. The Court notes, however, that Uber's discussion of these claims focuses entirely on Plaintiff's allegations regarding non-compliance with CPUC regulations, not on any allegations of misrepresentation. See id. Plaintiff's CPUC-based claims, however, have already been dismissed under section 1759.

relationship" with "the class of all potential buyers for [plaintiff's] property." Id. at 522-23. "The problem with this 'lost opportunity' approach is that it allows recovery no matter how speculative the plaintiff's expectancy," and "assumes what normally must be proved, i.e. that it is reasonably probable the plaintiff would have received the expected benefit had it not been for the defendant's interference." Id. at 523. At least one other federal court has accepted the same argument. See O'Conner v. Uber Technologies, Inc., 58 F. Supp. 3d 989, 998 (N.D. Cal. 2014) ("[I]nterference with potential customers with whom the plaintiff did not have an existing relationship generally is not sufficient to state a claim.").

Here, Plaintiff has stated that his claims are based on "interfere[nce] with Plaintiffs' economic relationships with passengers who ride in taxicabs of the medallion owners." ECF No. 1 at 25. Much like in Westside Center, his claims are therefore dependent on the hypothetical future relationship with potential buyers.

Plaintiff argues that this line of reasoning is undermined by his seeking to represent a class of all "medallion owners themselves when they are driving their own taxis and when individuals who rent/lease the medallion owners taxis are driving." ECF No. 27 at 15. Therefore, he argues, "you have the 'universe of taxicabs' licensed in the CCSF." Id. In other words, Plaintiff seems to argue that even if he cannot show with reasonable probability that Uber's unlawfully obtained profits would go to any one particular taxicab, this is irrelevant because he seeks to represent *all* taxicabs.[5]

Even assuming that Plaintiff's reasoning is sound, it is unpersuasive. Plaintiff's argument relies on the assumption that all potential customers would use either Uber's services or a taxicab, and therefore that taxicabs would obtain additional profits "but for" Uber's fraudulent statements inducing customers to use its services instead. In truth, customers obviously have numerous other alternatives to both Uber and taxicabs, such as another similar service like Lyft, public

---

[5] It is not entirely clear whether Plaintiff intends for this argument to be a defense of his UCL/FAL claims or his interference claims. Though he makes this argument in the section of his brief referencing his interference claims, he cites to Defendants' arguments in their brief on his UCL/FAL claims and to case law discussing the UCL. See ECF No. 27 at 15-16. In any event, the Court construes this argument as a defense of Plaintiff's interference claims, given that Uber's arguments are similar to the ones made against Plaintiff's UCL/FAL claims.

transportation, or not using any kind of transportation service at all.

Accordingly, to the extent Plaintiff seeks to bring interference claims based on Uber's alleged misrepresentations regarding the safety of its rides, these claims are dismissed without prejudice.

## IV. MOTION TO STRIKE

Defendants request in the alternative that if the Court does not dismiss Plaintiff's CPUC-based claims and his claims similar to those dismissed in L.A Taxi, it instead strike the allegations related to those claims. ECF No. 22 at 30. Because the Court has concluded that these claims should be dismissed, there is no need to consider the motion to strike.

In any event, motions to strike are disfavored at the pleading stage, and "are generally not granted unless it is clear that the matter sought to be stricken could have no possible bearing on the subject matter of the litigation." Rosales v. Citibank, Fed. Sav. Bank, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001). While Plaintiff acknowledges some of his allegations are not "essential" to his claims, he also correctly asserts that they are directly related to his claims and provide context for them. ECF No. 27 at 16-17. The Court concludes that striking these allegations would not serve "the function . . . of avoid[ing] the expenditure of time and money that must arise from litigating spurious issues," Whittlestone, Inc. v. Handi–Craft Co., 618 F.3d 970, 973 (9th Cir. 2010) (internal quotation marks and citation omitted), and accordingly denies the motion to strike.

## CONCLUSION

Uber's motion to dismiss is granted without prejudice. In sum, any of Plaintiff's claims that depend on his CPUC-based allegations are dismissed under section 1759. Moreover, his UCL claims are dismissed, and his FAL claims are dismissed to the extent they request restitution. His intentional interference and negligent interference claims are dismissed to the extent they depend on his allegations regarding Uber's safe rides fees. Combined with the jurisdictional bar of section 1759, this requires dismissal of his interference claims entirely. Accordingly, Plaintiff's remaining claims are under the Lanham Act as well as any non-restitution claims under the FAL.

/ / /

/ / /

The motion to strike is denied.  Plaintiff may file an amended complaint within 14 days of the issuance of this order.

**IT IS SO ORDERED.**

Dated:  February 22, 2016

_____
JON S. TIGAR
United States District Judge